2019 PA Super 61

| | | |
|---|---|---|
| STEPHEN H. SENSENICH, AND DEBBIE SENSENICH, HIS WIFE | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : : | |
| v. | : : | |
| | : | No. 1679 WDA 2017 |
| EHAB F. MORCOS, M.D., WESTMORELAND COUNTY CARDIOLOGY, INC., WESTMORELAND REGIONAL HOSPITAL, AND EXCELA HEALTH | : : : : : | |

Appeal from the Judgment Entered October 17, 2017
In the Court of Common Pleas of Westmoreland County Civil Division at
No(s):  736 of 2013

BEFORE:  BOWES, J., SHOGAN, J., and STABILE, J.

OPINION BY BOWES, J.:                     FILED FEBRUARY 27, 2019

Stephen H. Sensenich and his wife, Debbie,[1] appeal from the judgment entered in favor of Ehab F. Morcos, M.D., Westmoreland County Cardiology, Inc. ("WCC"), and Westmoreland Regional Hospital and Excela Health (collectively "Excela"[2]), on October 17, 2017.  After thorough review, we affirm.

The instant case is one of more than one hundred cases comprising the IN RE: WESTMORELAND HOSPITAL CARDIAC STENT LITIGATION.[3]  The claims

_____

[1] For ease of reference, we refer to Plaintiffs as "Mr. Sensenich."

[2] At all times relevant hereto, Excela Health operated Westmoreland Regional Hospital.

[3] The litigation is also referred to as the Excela Health Stent Litigation.

arise from allegedly unnecessary cardiac stenting procedures performed by Dr. Morcos and George BouSamra, M.D., during their affiliation with WCC. The cases were coordinated, but not consolidated, for discovery and pretrial proceedings.

The facts giving rise to Mr. Sensenich's claims are as follows. During the spring of 2008, Mr. Sensenich was experiencing shortness of breath and other symptoms associated with heart disease. He underwent a stress test in June 2008 at WCC. The test revealed that the inferior wall and the apex of his heart were not getting enough blood. Dr. Morcos, an interventional cardiologist with WCC, advised Mr. Sensenich at that time that two vessels needed to be stented.

A stent is a small mesh cylinder. Mr. Sensenich's expert, John Setaro, M.D., described the stenting procedure as follows. During a heart catheterization, a wire is passed through the vessel to create a track, much like a guidewire. A balloon on the end is inflated to push the plaque aside in the vessel. The balloon disappears and leaves the stent behind to keep the vessel open and allow red blood cells to pass through freely. Sometimes, instead of placing a single stent at the location of the lesion, multiple stents are deployed to cover the entire lesion and connect healthy tissue to healthy tissue.

The medical experts of both Mr. Sensenich and Dr. Morcos agreed that the standard of care was to stent any lesion or blockage of seventy percent or more as depicted on an angiogram. The dispute between the experts focused

on the extent of the blockages in Mr. Sensenich's left anterior descending vessel ("LAD") and circumflex arteries and whether placement of a stent or stents in those vessels was medically indicated.

On October 6, 2008, Mr. Sensenich underwent the first of three cardiac catheterization procedures performed by Dr. Morcos. Dr. Morcos inserted two stents in a lesion located in the right coronary artery. It was undisputed that the October stenting procedure was medically necessary as Mr. Sensenich's right coronary artery was ninety percent blocked, blood flow was low, and Mr. Sensenich was experiencing symptoms consistent with occlusion. There was no criticism of Dr. Morcos's use of two stents to cover the entire lesion.

On November 10, 2008, Mr. Sensenich returned for a second catheterization to place a stent in his LAD. Since there was calcium build-up in the artery, Dr. Morcos performed a rotational atherectomy, a procedure involving the use of a small drill to break up the calcium deposits. During the drilling, the LAD was dissected, a known complication of such a procedure. Dr. Morcos deployed several stents to repair the vessel. Mr. Sensenich spent four days in the Intensive Care Unit following the procedure, but recovered.

In early December, Juan Chahin, M.D., of WCC performed an angiogram to check on the status of the stents placed during Mr. Sensenich's November procedure. He advised Mr. Sensenich that everything was good, but that he would require another procedure on a different vessel. On December 30, 2008, Dr. Morcos placed a stent in Mr. Sensenich's circumflex artery without complication.

The record reveals that in February 2008, physicians from Latrobe Cardiology Associates ("Latrobe"), a general cardiology group owned by Excela, began complaining of unnecessary and excessive stenting by WCC interventional cardiologists. Dr. Robert Staffen, Dr. Mark Milchak, and the other Latrobe cardiologists did not personally perform stenting procedures. Prior to their affiliation with Excela, they referred their patients to UPMC or Allegheny General Hospitals in Pittsburgh for stenting procedures. Post-merger, Excela directed them to refer their patients to WCC instead. Latrobe cardiologists complained to Excela that their referrals to WCC were not returning to Latrobe for continued treatment. They attributed this to unnecessary or excessive stents being placed by WCC physicians, with scrutiny focusing on Drs. Morcos and BouSamra. In October 2008, Dr. Staffen brought those concerns to a joint conference committee meeting at Excela.

Shortly thereafter, Excela's chief of cardiology resigned, and in January 2009, the joint conference committee hired Mahdi Al-Bassam, M.D., an independent interventional cardiologist, to perform a review of Excela's interventional cardiology program. From February through April 2009, Dr. Al-Bassam reviewed sixty-three cases of Drs. Morcos and BouSamra from the three-month period of December 2008 through February 2009, as well as any case presented for review by Latrobe. He issued a final report dated April 26, 2009, wherein he stated that he found no abuse based on his review.

Latrobe was not satisfied with Dr. Al-Bassam's review. They felt that he had looked primarily at cases with complications and failed to address their

concern: that unnecessary stenting procedures, i.e., procedures that were not medically indicated, were being performed by these physicians. In May 2010, the new Excela CEO, Robert Rogalski, M.D., recommended a second review focusing on the appropriateness of medical decisions regarding interventional cardiology procedures. Mercer Health & Benefits, LLC ("Mercer") was retained to perform the review, and issued its preliminary findings in September 2010. The results were held to be peer-review protected, and thus undisclosed at trial, although they were shared with Drs. Morcos and BouSamra.

On February 12, 2011, Drs. Morcos and BouSamra resigned from the medical staff of Excela. Dr. Rogalski testified at trial that it was his intent to suspend their privileges based upon Mercer's report. That same month, Excela arranged for another on-site review conducted by the American Medical Foundation for Peer Review and Education, Inc. ("AMF"). Again, the report was deemed to be privileged peer-review. However, evidence was introduced at trial that, following that review, repayments were made to Medicare.

On March 3, 2011, Excela sent letters to patients of Drs. Morcos and BouSamra who had received stents in 2009 and 2010, advising them that, after performance of quality reviews, "a coronary stent you received during a procedure performed by either Drs. BouSamra or Morcos may not have been medically necessary. In other words, your medical condition and the perceived blockage in your artery may not have justified the placement of a coronary stent." Defendants Exhibit K, at 1. The correspondence clarified further that the review focused solely on the "medical necessity of the

coronary stent procedure" and "did not uncover any concerns about the quality or safety of the coronary stent device itself." Id. A media advisory from Excela informed the public that stents may have been implanted at Westmoreland Regional Hospital's catheterization laboratory that were medically unnecessary. Additional letters were sent to other patients on June 20, 2011. See Plaintiff's Exhibit 80. Mr. Sensenich did not receive a letter, but he pled in his complaint and testified in his deposition that he learned of the unnecessary stenting practices from media coverage.

Mr. Sensenich commenced the instant lawsuit against Dr. Morcos, WCC, and Excela (collectively "Defendants") by filing an approved short form complaint on February 20, 2013. He alleged therein that his second and third stenting procedures, performed by Dr. Morcos in November and December 2008, were not medically necessary. Mr. Sensenich averred that the LAD and circumflex arteries were less than seventy percent occluded, and that intervention with a stent was unnecessary, negligent, and contrary to the standard of care. He also pled that the performance of the unnecessary procedures constituted the intentional tort of battery as Mr. Sensenich had not given valid informed consent for the procedures.

According to Mr. Sensenich, Excela either knew or should have known about the unnecessary stenting practices of Dr. Morcos and WCC in February 2008 when Latrobe cardiologists complained, and Excela was negligent in failing to oversee its physicians and develop policies and protocols regarding proper cardiac intervention. Alternatively, Mr. Sensenich alleged that Excela

was complicit or conspired with WCC and its physicians in the performance of unnecessary stenting procedures. The Sensenich complaint incorporated the claims set forth in the master long form complaint sounding in battery, lack of informed consent, medical negligence, corporate negligence, fraud, civil conspiracy, violations of the Unfair Trade Practices and Consumer Protection Law, unjust enrichment, and loss of consortium.

After extensive discovery, Defendants moved for summary judgment based, inter alia, on the statute of limitations. The trial court denied summary judgment on that ground, stating that it "agrees with Plaintiffs' argument that the Discovery Rule tolls the statute of limitations in this matter, and that therefore Plaintiffs' Complaint was filed timely."[4] Order, 7/14/15, at ¶3.

A jury trial commenced before the Honorable Anthony G. Marsili on March 6, 2017. Plaintiff's expert cardiologist, Dr. Setaro testified that the angiograms revealed that Mr. Sensenich's LAD was "at most 20 percent" occluded; the left circumflex coronary artery was "well under fifty percent" blocked. N.T. Vol. III, 3/8/17, at 612-13. He concluded that the stenting of those two vessels was contrary to the standard of care. Dr. Morcos's expert,

---

[4] Defendants also moved for a nonsuit at the close of Plaintiff's case, and later a directed verdict, based on the statute of limitations. They maintained that Plaintiff had not established the applicability of the discovery rule. The trial court denied the motions, stating that it had already decided the issue. Although Defendants obtained a favorable verdict, they filed a motion for post-trial relief seeking judgment in their favor based on the statute of limitations, and later filed defensive cross appeals with this Court, which were docketed at 1742 WDA 2017. Defendants subsequently discontinued their cross appeals because they were not necessary to preserve their argument that the statute of limitations barred the action.

Jeffrey A. Breall, M.D., upon review of those same angiograms, testified that they showed a ninety percent blockage in the LAD, and a seventy percent blockage in the circumflex coronary artery. He opined that the stenting of these vessels was medically appropriate and necessary.

Much of the evidence at trial was devoted to proving that Excela knew or should have known as early as February 2008 that WCC's physicians, specifically Dr. Morcos, were performing unnecessary stenting procedures. Mr. Sensenich offered testimony from former Excela administrators and Latrobe cardiologists, as well as a hospital administration expert, to establish that Excela breached its duty of corporate oversight by failing to timely address these issues.

It was Excela's position that it had no basis to conclude in 2008 that unnecessary stenting was occurring. It interpreted Latrobe's complaints as limited to the insertion of too many stents during the course of medically necessary procedures, not the performance of stenting procedures on vessels that were not sufficiently occluded to warrant them. A higher volume of stents could be explained by WCC's adherence to the technique of healthy-to-healthy stenting, which tended to utilize more stents, rather than spot stenting that used one stent to open a vessel. Excela maintained that there were two schools of thought regarding the preferred manner of stenting. Furthermore, it criticized Latrobe's failure to take the issue to peer review. Finally, it questioned whether the complaints were legitimate or based on self-interest, citing the acrimonious relationship between Latrobe and WCC.

At the conclusion of the two-week trial, the jury returned a verdict in favor of Defendants. In response to special interrogatories, the jury found that Dr. Morcos did not fail to obtain Mr. Sensenich's informed consent, did not commit a battery, and was not negligent in his treatment of Mr. Sensenich. Verdict Slip, 3/20/17, at 1-2. Based on those findings, the jury did not reach the claims of corporate negligence against Excela and civil conspiracy among all Defendants.

Mr. Sensenich filed a timely motion for post-trial relief in which he alleged that the trial court erred in giving a two schools of thought instruction to the jury. Defendants also filed post-trial motions alleging that the trial court erred in denying their motion for directed verdict based on the statute of limitations. By order dated October 4, 2017, the court denied Mr. Sensenich's post-trial motion. The court maintained that the jury instruction was proper, and further, that since the jury never reached the issues of corporate negligence and conspiracy, any error in the two schools of thought charge was harmless. The court did not address the issue of the statute of limitations raised in the Defendants' motions.

Judgment in favor of Defendants was entered on October 17, 2017, and Mr. Sensenich timely appealed. Defendants filed a defensive cross-appeal raising the statute of limitations, but subsequently dismissed it. They argue herein that the statute of limitations provides an alternate basis to affirm.

On appeal, Mr. Sensenich raises three issues for our review:

[I] Was it reversible error for the trial court to charge the jury with the "two schools of thought doctrine" where both parties agreed that vascular stents were an acceptable form of treatment for blockages greater than 70%, and differed only with respect to whether the plaintiff's arteries had reached that particular degree of compromise?

[II.] Was it reversible error in this instance for the trial court to charge the jury with the "two schools of thought" doctrine when it declined to identify the specific treatment to which the doctrine applied?

[III.] In the alternative, did the [D]efendants fail to satisfy the evidentiary threshold for a jury charge on the "two schools of thought" doctrine when [D]efendants' expert testified only that "many operators" employed "normal to normal" stenting instead of "spot stenting," where the Supreme Court requires that a "considerable number" of physicians must employ the alternative technique to warrant a two schools instruction?

Appellant's brief at 4.

In their counterstatements of the issues, Defendants maintain that there was no error in the two schools of thought instruction, or, if there was error, it did not affect the verdict. Alternatively, they contend that the court erred in refusing to grant a nonsuit and dismiss the case based on the statute of limitations. Brief of Appellees Westmoreland Regional Hospital and Excela Health, at 4; Brief of Appellees Morcos and WCC, at 2.

All three of Mr. Sensenich's assignments of error implicate the trial court's jury instruction on two schools of thought. When "examining jury instructions, our scope of review is limited to determining whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." Passarello v. Grumbine, 87 A.3d 285, 296-97 (Pa. 2014) (quoting Quinby v. Plumsteadville Family Practice, Inc., 907 A.2d

1061, 1069-70 (Pa. 2006)). "Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." Id. Generally, a charge will be found adequate "unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error." Id. The issue of adequacy of an instruction is one of law, and hence, our review is plenary. Id.

The instruction at the heart of this appeal involves the two schools of thought doctrine. The concept of two schools of thought was discussed in Remley v. Plummer, 79 Pa. Super. 117, 121-22 (1922). In Remley, plaintiff's decedent died after the defendant physician administered general anesthesia to facilitate repair of a crushed and partially amputated finger. Plaintiff's expert opined that it was negligent not to use a local anesthetic, or if using general anesthesia, not to administer morphine to stimulate the patient's heart. The defense offered seven neighborhood surgeons who testified that the defendant physician's treatment was "in accord with the best modern surgical practice," and that it was a matter of judgment whether to use a local or general anesthesia. Id. at 120. The trial court asked the jury of laymen to decide from the conflicting medical testimony which method was safer and better. On appeal, this Court rejected that approach. We held that, "If the treatment is in accordance with a recognized system of surgery, it is not for the court or jury to undertake to determine whether that system is

best, nor to decide questions of surgical science on which surgeons differ among themselves." Id. at 123 (citations omitted). Where the "testimony clearly showed a difference of medical opinion, expressed by physicians and surgeons of unquestioned standing and reputation, . . . the defendants were not negligent for having adopted the view held by the majority of their brethren who testified." Id.

Forty years later, after the doctrine underwent further refinement, our High Court summed it up in one sentence: "Where competent medical authority is divided, a physician will not be held responsible if in the exercise of his judgment he followed a course of treatment advocated by a considerable number of recognized and respected professionals in his given area of expertise." Jones v. Chidester, 610 A.2d 964, 969 (Pa. 1992). In Jones, our Supreme Court acknowledged that "[a] medical practitioner has an absolute defense to a claim of negligence when it is determined that the prescribed treatment or procedure has been approved by one group of medical experts even though an alternate school of thought recommends another approach, or it is agreed among experts that alternative treatments and practices are acceptable." Id. at 965.

In order to refute evidence that Excela knew or should have known, for purposes of corporate negligence, from Latrobe's complaints and the sheer volume of stents used at WCC, that there was unnecessary stenting being performed, Defendants introduced evidence that there were two generally-recognized approaches to stenting. Some cardiologists adhered to the belief

that a single stent should be placed only at the location of the occlusion, a method called spot stenting. Others advocated in favor of the use of multiple stents, if necessary, to cover the entire lesion and connect healthy tissue to healthy tissue. WCC and Dr. Morcos subscribed to the latter approach. Defendants introduced this evidence ostensibly to explain why the number of stents used by WCC was substantially higher than other comparable hospitals, the inference being that the discrepancy could be attributed to healthy-to-healthy stenting rather than the performance of wholly unnecessary stenting procedures. Additionally, Defendants attempted throughout the trial to dismiss "unnecessary stenting" as nothing more than the use of multiple stents typical of the healthy-to-healthy stenting approach. Excela argued that due to the vagueness of Latrobe's complaints, it did not know, nor should it have known, that WCC and Dr. Morcos were placing stents in arteries where they were not medically indicated, i.e., where the percentage of blockage did not justify their insertion.

Mr. Sensenich offered evidence that Excela was informed that WCC physicians, particularly Drs. Morcos and BouSamra, were unnecessarily placing stents in vessels that were not sufficiently occluded to warrant that intervention. He maintained that WCC's adherence to the healthy-to-healthy stenting method had no bearing on that issue, and objected to the defense's introduction of evidence calculated to show that the technique was accepted and employed by a considerable number of respected physicians. Those objections were generally overruled.

Defendants subsequently requested that the two schools of thought jury instruction be given. Mr. Sensenich objected, maintaining that two schools of thought was "completely irrelevant . . . to any theory in this case and should not be given." N.T. Vol. IX, 3/16/17, at 2055. First, Mr. Sensenich renewed his argument that there was only one school of thought on when a vessel should be stented. The trial court agreed, correctly recognizing that Mr. Sensenich's claims against Dr. Morcos and WCC were based on the physician's stenting of vessels that were not sufficiently occluded to warrant placement of any stent at all. Thus, the trial court refused the two schools of thought instruction with regard to the unnecessary stenting claims. Defendants concede on appeal that the doctrine had no application to the treatment rendered to Mr. Sensenich by Dr. Morcos.

Despite its ruling that the defense was inapplicable to the unnecessary stenting claims, Excela persisted in its argument that the instruction was proper with regard to the claims against Excela sounding in corporate negligence. Excela argued that the two schools of thought instruction was necessary so that the jury did not construe Excela's failure to accept Latrobe's view as negligence. Id. at 2056. Mr. Sensenich countered that the two schools of thought defense was "not an excuse for [Excela] failing to act" when it was aware of claims that patients were being harmed. Id. at 2057. He argued that Excela was using the instruction for that purpose, and that it was inappropriate. Id. Nonetheless, the trial court decided to give the instruction,

but advise the jury that the two schools of thought doctrine had no application to the unnecessary stenting claims. Id. at 2056.

In Thompson v. Nason Hospital, 591 A.2d 703 (Pa. 1991), our High Court defined corporate negligence of a hospital:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient.

Id. at 707. The hospital's duties fall into four general areas:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

Id. (citations omitted). However, in order to be corporately negligent, the hospital must have had actual or constructive knowledge of the defect or the procedures that caused the harm. Id. at 708. Moreover, as with liability for negligence generally, the hospital's negligence must have been a substantial factor in causing the harm.

After instructing the jury on factual cause of injury, the court gave the following instruction regarding the two schools of thought defense:

> Where competent medical authority is divided, a physician will not be held responsible if, in using his judgment, the physician followed a course of treatment advocated by a considerable number of respected and recognized professionals in his given area of expertise. This is known as the two schools of thought doctrine.

The defendant claims that in treating the plaintiff he consciously chose to follow a course of treatment. The defendant has the burden of proving by a fair preponderance of the evidence that a considerable number of recognized and respected professionals advocated the same course of treatment; that he is aware of these professionals advocating the same course of treatment at the time he treated the plaintiff; and that in treating the plaintiff he consciously chose to follow their recommended course of treatment.

If you decide that the defendant has met this burden of proof, then you should find for the defendant.

However, the plaintiff contends that the defendant was negligent in placing unnecessary stents into this particular plaintiff. The two schools of thought doctrine has no application to this type of claim, and you may not consider the doctrine regarding that claim of unnecessary stents.

N.T. Vol. X, 3/17/17, at 2229-30. The court proceeded then to instruct the jury on the liability of a health care institution that violates its duty to ensure its patients' safety and well-being.

Mr. Sensenich contends that it was reversible error to instruct the jury at all on the two schools of thought doctrine. Mr. Sensenich maintained throughout that the claim against Dr. Morcos had nothing to do with the stenting method used, but whether even one stent should have been inserted in his LAD and circumflex arteries. He argues further that the doctrine has no application in the corporate negligence context. Mr. Sensenich argued at trial, and again on appeal, that Excela could not use the two schools of thought defense to excuse its failure to act timely when it was aware that patients were being harmed. Furthermore, Mr. Sensenich asserted that Defendants did not establish the evidentiary foundation required for such a defense to

apply. Finally, Mr. Sensenich contends that, as given, the charge constituted reversible error because it failed to identify the claims to which the defense applied.

Defendants remind us that the trial court has broad discretion in fashioning its jury charge, and that we must review it in its entirety. Excela contends first that the instruction was proper. Excela maintains that Latrobe's vague complaints of "too many stents" and "unnecessary stents," as well as statistics showing that WCC used a much higher overall number of stents than similarly-sized facilities, could be explained away by WCC's adherence to the healthy-to-healthy stenting approach. It also was consistent with a higher volume of medically necessary stents being placed, and it was vital to its defense that the higher overall volume of stents placed not be deemed actual or constructive notice to support a corporate negligence claim. According to Defendants Dr. Morcos and WCC, the existence of two schools of thought, i.e., spot stenting and healthy-to-healthy stenting, undermined Mr. Sensenich's claim that Excela had knowledge or notice of unnecessary or excessive stenting, but failed to exercise its oversight duties and responsibilities.

Defendants contend further that they provided adequate factual support for the instruction through the testimony of Leslie Boltey, Dr. James Adisey, Dr. Setaro, Dr. Breall, Dr. Burroughs, and Dr. Morcos, all of whom testified that heathy-to-healthy stenting is a method recognized by a considerable number of respected cardiologists.

Moreover, according to Defendants, "the trial court made it obvious the Two Schools of Thought doctrine did not apply to the claims as related to Mr. Sensenich himself and the jury was instructed not to consider that doctrine to determine whether Mr. Sensenich received unnecessary stents." Brief of Appellees Morcos and WCC, at 22. They contend that, by implication, the jury would have understood that the doctrine applied to the only remaining claims: corporate negligence against Excela and conspiracy claims against Excela, Morcos, and WCC.

Finally, Defendants posit that any error in giving the instruction had no impact on the outcome of the case as the trial court told the jury that it did not apply to the unnecessary stenting claim, and the jury did not reach the corporate negligence and civil conspiracy claims. Defendants rely upon Boyle v. Indep. Lift Truck, Inc., 6 A.3d 492 (Pa. 2010), in support of their contention that any error in giving the instruction was harmless as the jury did not deliberate over the corporate negligence claim to which the allegedly erroneous two schools of thought instruction applied. Brief of Appellees Morcos and WCC, at 39. In Boyle, supra, our High Court reaffirmed the principle that "where a jury, through a special verdict sheet, finds no negligence on the part of a defendant . . . any purported error regarding a question on comparative negligence is non-prejudicial, and does not serve as a basis for a new trial." Id. at 496.

The two schools of thought doctrine is a red herring in the instant case. Despite the fact that this litigation turned on whether the placement of stents

in Mr. Sensenich's LAD and circumflex arteries was medically indicated, Defendants managed to shift the focus of the litigation to the manner in which stenting was performed rather than whether the arteries should have been stented at all. From there, it was a short leap to the two schools of thought: healthy-to-healthy stenting versus spot stenting. The trial court correctly recognized that the two methods of stenting had nothing to do with Dr. Morcos's decision to place even one stent in a vessel that was not sufficiently occluded to warrant that intervention, and refused to give the two schools of thought instruction with regard to the unnecessary stenting claim. Nonetheless, it was seduced by Defendants' novel argument that Excela's failure to respond earlier to Latrobe's complaints could be excused by the fact that WCC's practice of healthy-to-healthy stenting used more stents. The claims against Excela turned on whether the hospital was derelict in ensuring the safety of patients and supervising its physicians, and whether that negligence was a substantial factor in Mr. Sensenich undergoing two unnecessary medical procedures.

The two schools of thought doctrine operates to insulate physicians from liability when the allegedly negligent medical treatment is one accepted by a considerable number of respected physicians. Herein, it was misused to negate Latrobe's notice to Excela of medically unnecessary stenting procedures being performed within its walls. The question for purposes of corporate negligence was whether Excela, which had a duty to safeguard its patients, responded reasonably to those complaints. The existence of two

different stenting techniques, healthy-to-healthy stenting and spot stenting, may have had a bearing on the reasonableness of Excela's perception of Latrobe's complaints. However, the two schools of thought defense had nothing to do with whether Excela had the requisite notice of the unnecessary stenting procedures, and the trial court erred in instructing the jury to find for Defendants if it found two schools of thought.[5]

Mr. Sensenich contends that instructing the jury regarding a defense that did not apply at all was reversible error. In support of his position, he relies upon our decision in Choma v. Iyer, 871 A.2d 238, 240 (Pa.Super. 2005) (en banc), where we ordered a new trial because the trial court's charge instructing the jury on inapplicable law was fundamentally erroneous and may have been responsible for the verdict. Mr. Sensenich complains that the two schools of thought instruction was not only improperly given, but that prejudice stemmed from the fact that the court did not clarify as to what claim the defense applied. He relies upon our Supreme Court's decision in Levine v. Rosen, 616 A.2d 623 (Pa. 1992), reversing a defense verdict because the court neglected to tell the jury whether the two schools of thought defense applied to the defendant physician's failure to diagnose her cancer, or to his

_____

[5] Defendants do not offer any rationale as to why the two schools of thought instruction was appropriate with regard to the civil conspiracy claim, and we cannot conceive of any.

negligence in failing to order her to undergo an annual mammogram.[6]  Since the Court found that the defense did not apply to the negligent failure to diagnose, the error was not harmless.

Similarly, in Sinclair by Sinclair v. Block, 633 A.2d 1137 (Pa. 1993), a defense verdict was overturned because the court did not clarify whether the two schools of thought defense was applicable to the theory that the physician was negligent in failing to do a caesarean section ("c-section") and using forceps instead, or whether it applied to the theory that the obstetrician applied the forceps improperly.[7]  Since the defense was inapplicable to the claim that the forceps were applied negligently, the trial court's failure to clarify that the instruction applied only to the physician's negligent decision to forego a c-section, a new trial was required.

_____

[6] The two schools of thought instruction in Levine v. Rosen, 616 A.2d 623, 628 (Pa. 1992), consisted only of the following:

> A physician may rightfully choose to practice his profession in accordance with a school of thought which differs in its concept and procedures from another school of thought.  Even though the school that he follows is a minority one, he will not be deemed to be negligent or practicing improperly, so long as it is reputable and respected by reasonable medical experts.

[7] The instruction in Sinclair by Sinclair v. Block, 633 A.2d 1137, 1142 (Pa. 1993), did not specify to which negligence claims it applied or did not apply:

> Where competent medical authority is divided, a physician will not be held responsible if, in the exercise of his or her judgment, he or she follows a course of treatment advocated by a considerable number of medical authority in good standing in his or her community.

Mr. Sensenich maintains that the trial court omitted a portion of the third paragraph of the suggested standard charge that informed the jury as to which claims the defense applied. He contends that the omission cannot be deemed harmless. Moreover, according to Mr. Sensenich, simply telling the jury that the doctrine did not apply to the unnecessary stenting claims was confusing. He maintains that even in those cases in which the instruction was appropriate as to one negligence claim, specifically Levine and Sinclair, we ordered a new trial where the trial court failed to specify to which claims the doctrine applied.

Excela attempts to distinguish the instant case from Levine and Sinclair on the sole ground that this is not a failure-to-diagnose case. Dr. Morcos and WCC argue, however, that since the trial court made it clear that the instruction did not apply to claims of unnecessary stenting, and special interrogatories reveal that the jury did not reach the issues of corporate negligence and civil conspiracy, any error in giving the charge was harmless. Brief of Appellees' Morcos and WCC, at 38.

The third paragraph of Pa. S.S.J.I. (Civ.) 14.50 provides:

> These instructions apply only to the plaintiff's claim that [identify applicable theory of liability]. The plaintiff also contends that the defendant was negligent in [identify remaining theories of liability]. The "two schools of thought" doctrine has no application to [this other claim] [these other claims] and you may not consider the doctrine regarding [this other claim] [these other claims].

Pa.S.S.J.I. (Civ.) 14.50.

The record confirms that the trial court omitted the first two sentences of the third paragraph of the suggested charge describing the claim or claims to which the instruction applied, and identifying the remaining theories. It is unclear from the record whether this was by design or inadvertence. Furthermore, we see nothing in the record that suggests that Mr. Sensenich specifically asked the court to explicitly state which claims were governed by the instruction, or that the court declined to do so.[8] Nonetheless, the court instructed the jury that the doctrine had no application to the unnecessary stenting claims against Dr. Morcos, and that it could not consider the doctrine with regard to those claims.

It is well-settled that trial courts have broad discretion in phrasing jury instructions. Vallone v. Creech, 820 A.2d 760 (Pa.Super. 2003). A court may choose its own wording as long as the law is "clearly, adequately and accurately presented to the jury for its consideration." Id. at 764. Generally, "[a] charge will be found adequate unless 'the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to a fundamental error.'"

_____

[8] In fact, at the close of its charge to the jury, the trial court asked trial counsel if it had forgotten anything or if they had any objections for the record. We note that counsel for Mr. Sensenich did not avail himself of this opportunity to point out the omitted portion of the standard instruction and ask that the court clarify for the jury to which claims the instruction applied. Failure to do so tends to undermine Mr. Sensenich's position that, viewing the charge in its entirety, the omission of that portion of the standard charge was so prejudicial as to constitute reversible error.

Quinby, *supra* at 1069-70 (Pa. 2006) (quoting Stewart v. Motts, 654 A.2d 535, 540 (Pa. 1995)). A new trial is not warranted unless "there is a prejudicial omission of something basic or fundamental." Stewart, *supra* at 606 (quoting Sweeny v. Bonafiglia, 169 A.2d 292, 293 (Pa. 1969)).

We find the language used by the trial court herein sufficient to apprise the jury that the instruction was inapplicable to the unnecessary stenting claims, which were the only claims the jury reached in rendering its verdict. That was not the case in Levine and Sinclair. In each of those cases, the trial court issued the instruction without qualifying its application in any manner. Thus, the jury, presumed to follow the court's instructions, would have applied it to both claims. Since the defense only properly applied to one of two negligence claims, and the jury deliberated and rendered a verdict as to both, the error could not be deemed harmless.

In contrast to the situations in Levine and Sinclair, the court herein specifically told the jury that the instruction was not applicable to the claims of unnecessary stenting against Dr. Morcos and that it could not consider it with regard to those claims. See N.T. Vol. X, 3/17/17, at 2230. The court's direction was clear and explicit. The only claims upon which the jury reached a verdict were those unnecessary stenting claims. We must presume that the jury followed the direction of the trial court and did not consider the defense with regard to those claims. See Maya v. Johnson and Johnson, 97 A.3d

1203, 1222 (Pa.Super. 2014) ("the law presumes that the jury will follow the instructions of the court").

In sum, we see no indication that the erroneous two schools of thought instruction contributed to the verdict. Although the instruction should not have been given at all, the jury was told that it did not apply to claims of unnecessary stenting. The jury rejected Mr. Sensenich's claim that the stenting procedures were unnecessary when it specifically found that Dr. Morcos did not fail to obtain informed consent, did not commit a battery, and was not negligent in his treatment of Mr. Sensenich.[9]

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2019

_____

[9] In light of our disposition, we need not reach the statute of limitations issue argued by Defendants as an alternative basis for affirmance.